Filed 9/16/14  P. v. Rocha CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JUAN ROCHA,<br><br>        Defendant and Appellant. | D062907<br><br><br><br>(Super. Ct. No. SCN289751) |

APPEAL from a judgment of the Superior Court of San Diego County, Runston G. Maino, Judge.  Affirmed.

Carl Fabian, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Raquel M. Gonzalez, Deputy Attorneys General, for Plaintiff and Respondent.

Juan Rocha appeals a judgment following his jury conviction of one count of second degree murder (Pen. Code, § 187, subd. (a))[1] with a true finding that he committed the murder for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). The prosecution's theory at trial was that the murder was the natural and probable consequence of Rocha's commission of the uncharged target offenses of assault and/or challenge to fight in public. On appeal, Rocha contends: (1) the evidence is insufficient to support his conviction of second degree murder; (2) the trial court prejudicially erred by not instructing sua sponte on involuntary manslaughter as a lesser included offense of murder; (3) the evidence is insufficient to show his gang had as a primary activity any of the offenses listed in section 186.22, subdivision (e); (4) the trial court erred in instructing on the elements of the gang allegation; and (5) the trial court erred by not instructing on all of the elements of the uncharged target offenses that were the basis for the murder charge. We find any error in failing to instruct on involuntary manslaughter was harmless. We reject Rocha's remaining contentions and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On March 25, 2011, Reuben Jones and Devon Allen, both African-American, were drinking beer at a restaurant and bar in Carlsbad. They later met Eric Smith and two others there. After drinking several beers, Jones, Allen and Smith left and walked toward their cars, which were parked on a nearby street. To get to their cars, they went through a hedge. Smith went first, then Allen, and finally Jones.

---

[1] All statutory references are to the Penal Code.

After Jones passed through the hedge, he saw two men, Rocha and Pedro Avalos, on the sidewalk on the other side of the hedge. In a nonthreatening manner, Rocha asked Jones for a lighter and Jones handed him his lighter. Rocha then asked him whether he knew where he was. Based on his past experience, Jones believed that question was gang-related, but the question did not initially bother him. Jones replied, "Yeah, Carlsbad," smirking because he knew he was in the City of Carlsbad. Rocha then tilted his head and shoulders back, inflated his chest, and responded, "Carlos Malos."

Allen then walked back to where Jones was and asked: "What's poppin [sic]? Is there a problem?" Avalos replied to Allen, "What's up, homie," opened a small knife with a clicking sound, bounced on his feet like a boxer, and then stabbed Allen in the abdomen with the knife. Jones immediately punched Rocha and then Rocha and Avalos ran away from the scene. Allen died from the stab wound later that night.

On March 29, Rocha was arrested in Indianapolis, Indiana. On March 31, Carlsbad Police Detective Bryan Hargett and Sergeant Mickey Williams interviewed Rocha in Indianapolis. Rocha admitted he was present at the scene of the stabbing and was punched in the face by Jones. He denied seeing the stabbing, but eventually identified Avalos as the person who stabbed Allen. After he (Rocha) was "sucker punched" by Jones, he saw Allen lift his shirt and then realized Allen had been stabbed. Rocha said he "freaked out" and ran from the scene. Rocha denied having a knife that night and, prior to the stabbing, had asked Jones to "check" Allen and get him away. Rocha said he did not do anything to Allen and "never had any intentions." He admitted he burned his clothes after the incident. An information charged Rocha with one count of

murder and alleged the murder was committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1).

Prosecution's Case-in-Chief

At trial, the prosecution presented the testimony of Jones and other witnesses substantially as described above. Detective Hargett testified as the prosecution's gang expert. Since 2006, Hargett had personally investigated 95 percent of Carlsbad's violent gang cases. The Carlsbad gang, known as "Varrio Carlsbad," "Varrios Carlsbad Locos," and "Carlos Malos," consists of Hispanic males from 12 years old through men in their 50's, although the age of the core group probably goes up to about 25 years old. The gang had chosen to spell "barrio," the Spanish word for neighborhood, with a "v" instead of a "b."

The Carlsbad gang had historically been involved in narcotic sales, assaults, hate crimes, weapons purchases, weapons sales, thefts, and auto thefts. Gang members committed those crimes in the barrio to "protect," or control, the neighborhood. Since 2006, there had been an increase in gang crimes targeting African-Americans and others who enter the barrio. Hargett testified that since 2006, members of the gang had consistently engaged in a pattern of criminal activity. Hargett described "hit ups," which included phrases such as, "Where you from," "Do you bang," "Do you know where you are at," and "This is Carlsbad." Most "hit ups" occur with rival gang members and there was no good answer to such questions. In his training and experience, when a "hit up" occurs in close proximity to the other person, it likely turns into a violent encounter.

4

Hargett testified that in 2006, while investigating another case, he first met Rocha, then 14 or 15 years old and not considered a gang member at that time. Rocha's father admitted at that time he was the Carlsbad gang's "shot caller." Subsequently, Rocha became identified as a documented Carlsbad gang member, satisfying two or three of the Department of Justice's criteria. In December 2010, Rocha was contacted wearing gang attire (e.g., Chargers football clothing, a belt buckle with the letter "C," and socks pulled up to his knees). Rocha had also been seen with other gang members, including Avalos. He also had a tattoo of an Aztec serpent and a tattoo on the middle finger of his left hand, consisting of three dots, which meant "mi vida loca" (i.e., "my crazy life") and was common in Hispanic street gang culture. Based on those factors and his belief that Rocha claimed to be a Carlsbad gang member during his interview, Hargett testified he had no doubt Rocha was a devout Carlsbad gang member. Rocha did not have any documentation of violent crimes or harassment of African-Americans.

Hargett also testified regarding prior crimes committed by members of the Carlsbad gang. In July 2006, members of the Carlsbad gang confronted Ivan Pena and Johnny Pliego, who were passing through the barrio on their way home from school. Pliego was punched and pulled off his bicycle while gang members repeatedly yelled, "Carlsbad," and "Carlos Malos." One gang member stated: "Carlsbad bitch, thanks for the bike." Pliego suffered a fractured skull, a lacerated face, and chipped teeth. Three Carlsbad gang members (Raul Gonzales, Hector Garcia, and Angel Martinez) were arrested for the attack. Thereafter, in March 2007, when Pliego was walking home from school, gang members asked him, "Do you bang?" After Pliego denied gang

5

membership, one of the gang members stated: "He got paper on me," apparently referring to Pliego's court testimony against him for the July 2006 attack and his resulting probation or parole.

In November 2006, the Carlsbad gang attacked Bryce Smith, an African-American who lived in the barrio and attended the local high school. While Smith was walking home from school, gang members pushed him to the ground and repeatedly punched and kicked him. While doing so, one gang member stated, "This is C-town, bitch . . . . This is what happens when niggers try to roll C-town. . . . Carlos Malos, bitch. This is how we handle shit in Carlsbad." Avalos and several other Carlsbad gang members were later arrested for the attack.

In November 2007, Joe Torres and his friends drove into the Carlsbad barrio in response to a Craigslist advertisement for the sale of a weight bench. "[S]ome young gang members" threw rocks at their vehicle and, when they stopped their vehicle, the young gang members confronted them. As Torres and his friends called police, some older gang members approached and asked them, "Why are you fucking with the little homies?" During the subsequent fight, Torres was stabbed multiple times in the front and back of his torso. He was "life-flighted" to a hospital and survived the attack. Two Carlsbad gang members (Jesus Hernandez and Edgar Zepeda) were convicted for the attack on Torres.

In October 2008, a Carlsbad gang member (Juan Matias) approached Ms. Norwood, an African-American who lives in the barrio, in front of her house, called her a "nigger," and made a stabbing motion toward her with a small folding knife. After the

6

incident, Matias told his arresting officer, "Fuck that nigger bitch. I will kill that nigger bitch." Hargett testified that the Norwood family had been targeted by the Carlsbad gang for several years because of their African-American race.

In 2008, Eric Allen, an African-American, was driving through the Carlsbad barrio when "some guys" signaled for him to slow down. Allen stopped his car, got out, and apologized, stating: "Hey, I know I am in the hood. Sorry. No disrespect." A Carlsbad gang member (Christian Gill) stabbed Allen once in the arm and once in the gut with a small, pocket-style folding knife with a blade about two and one-half inches long. According to Hargett, with "about two feet of his intestines hanging out through his stab wound," Allen was able to get back into his car and drive to a nearby house from which he was then "life-flighted" to a hospital. Allen survived and Gill was convicted for stabbing him.

In February 2009, a group of people from Encinitas drove to a house party in Carlsbad. Their car had a sticker from an Encinitas surf shop with only the letter "E." Hargett testified that an Encinitas gang used the letter "E" as its sign and symbol. Outside the party house, Carlsbad gang members approached the Encinitas group (none of whom were gang members) and one gang member asked them, "What's up with that Encinitas sticker?" The group replied that they had come only to party and not for trouble. A Carlsbad gang member responded: "Fuck that. You are from Encinitas." A witness heard the clicking of knives being opened and a fight began. A majority of the Carlsbad gang members had knives. During the fight, a Carlsbad gang member (Raul

7

Gonzalez) pulled out a gun and shot at Alex Lopez, who was with the Encinitas group. The bullet mostly missed Lopez, but shot off his eyelid.

In June 2010, a Carlsbad gang member (Mizael Matias, Juan Matias's brother) walked by the Norwood family's home. Ms. Norwood, her son, and her daughter were outside. He yelled, "Fuck you, nigger," and threw a rock and piece of fruit at them. Later that month, Frederick Baker, Norwood's son, and an African-American friend were approached by several Carlsbad gang members in an alley. One gang member asked, "What's up, nigger?" Another gang member opened a small pocket knife and made a stabbing motion toward Baker. Baker dodged the knife, punched his attacker in the face, and escaped the attack.

## Defense Case

Rocha did not testify in his defense. He presented two character witnesses and a gang expert witness. Apolinar Echeverria, the gang expert, testified that it was not a good idea to be known as a "snitch" or an informant in certain neighborhoods and gang communities. Individuals and their families could suffer retaliation for snitching. Echeverria also considered the Department of Justice's standards for documenting gang members to be over-inclusive and gave an example involving tattoos of three dots and the Aztec serpent, which represented Mexican culture and were not necessarily gang tattoos. He testified that Hispanic street gangs did not like African-Americans living in the barrio. He also testified that gang members had an incentive to commit violent crimes, because they would then receive more respect in the gang.

In rebuttal, the prosecution presented the testimony of Allaina Mahone, who worked at the restaurant and bar involved in this case. She had seen Rocha a few times there before and knew him as "Buddy." Although he was always nice to her, she noticed a different "vibe" from him when other men were around. He only had that "vibe" when with his friends, whom she described as "kind of like gang bangers." She described Rocha's "vibe" as being more "confrontational" and called it "testing." However, she had never seen him fight there and had never heard of him fighting anyone outside.

### Verdict

The jury found Rocha guilty of second degree murder (§ 187, subd. (a)) and found true the gang enhancement allegation (§ 186.22, subd. (b)(1)). The trial court sentenced Rocha to an indeterminate term of 15 years to life for his murder conviction and stayed imposition of the alternative gang enhancement sentence. Rocha timely filed a notice of appeal.

## DISCUSSION

### I

### *SUBSTANTIAL EVIDENCE TO SUPPORT SECOND DEGREE MURDER CONVICTION*

Rocha contends the evidence is insufficient to support his conviction for second degree murder. He argues the evidence is insufficient to support a finding that murder was a natural and probable consequence of his commission of assault and/or challenge to fight in public in the circumstances of this case.

9

A

When a defendant challenges his or her conviction for insufficient evidence on appeal, we apply the substantial evidence standard of review. "Under this standard, the court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses *substantial evidence*--that is, evidence which is reasonable, credible, and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.] The focus of the substantial evidence test is on the *whole* record of evidence presented to the trier of fact, rather than on ' "isolated bits of evidence." ' " (*People v. Cuevas* (1995) 12 Cal.4th 252, 260-261, italics added in *Cuevas*.) We "must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) Furthermore, "[a]lthough we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*Ibid.*)

B

"A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the

10

additional crime, but whether, judged objectively, it was *reasonably* foreseeable."

(*People v. Mendoza* (1998) 18 Cal.4th 1114, 1133.)  The California Supreme Court

discussed the doctrine of natural and probable consequences, stating:

> "[W]hen a particular aiding and abetting case triggers application of
> the 'natural and probable consequences' doctrine, the [*People v.
> Beeman* (1984) 35 Cal.3d 547, 560] test applies, and the trier of fact
> must find that the defendant, acting with (1) knowledge of the
> unlawful purpose of the perpetrator; and (2) the intent or purpose of
> committing, encouraging, or facilitating the commission of a
> predicate or target offense; (3) by act or advice aided, promoted,
> encouraged or instigated the commission of the target crime.  But the
> trier of fact must also find that (4) the defendant's confederate
> committed an offense *other than* the target crime; and (5) the offense
> committed by the confederate was a natural and probable
> consequence of the target crime that the defendant aided and
> abetted."  (*People v. Prettyman* (1996) 14 Cal.4th 248, 262, fn.
> omitted.)

"A reasonably foreseeable consequence is to be evaluated under all the factual

circumstances of the individual case [citation] and is a factual issue to be resolved by the

jury." (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*).)

In this case, the trial court instructed the jury on the elements of murder, including

the natural and probable consequences theory of implied malice (CALCRIM Nos. 520 &

403), aiding and abetting (CALCRIM Nos. 400 & 401), and the elements of the

uncharged target offenses of assault and challenge to fight in public (CALCRIM Nos.

875 & 2688).  The trial court instructed with CALCRIM No. 520 on implied malice,

stating:  "The defendant acted with implied malice if: [¶] 1.  [H]e intentionally committed

an act; [¶] 2.  The natural and probable consequences of the act were dangerous to human

life; [¶] 3.  At the time he acted, he knew his act was dangerous to human life; [¶] AND

11

[¶] 4. [H]e deliberately acted with conscious disregard for [human] life." The court further instructed with a modified version of CALCRIM No. 403 on the doctrine of natural and probable consequences, stating:

> "Before you may decide whether the defendant is guilty of Murder, you must decide whether he is guilty of Assault and/or Challenge to Fight in Public.
>
> "To prove that the defendant is guilty of Murder, the People must prove that:
>
> "1. The defendant is guilty of Assault and/or Challenge to Fight in Public (with gang allegations).
>
> "2. During the commission of Assault and/or Challenge to Fight in Public (with gang allegations), a coparticipant in that Assault committed the crime of Murder; [¶] AND
>
> "3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the Murder was a natural and probable consequence of the commission of the Assault and/or Challenge to Fight in Public (with gang allegations).
>
> "A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator. It does not include a victim or innocent bystander.
>
> "A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If the murder was committed for a reason independent of the common plan to commit the Assault, then the commission of Murder was not a natural and probable consequence of Assault and/or Challenge to Fight in Public (with gang allegations).
>
> "To decide whether [the] crime of Assault and/or Challenge to Fight in Public (with gang allegations) was committed, please refer to the separate instructions that I will give you on those crimes[.]

12

"The People are alleging that the defendant originally intended to aid and abet Assault and/or Challenge to Fight in Public.

"If you decide that the defendant aided and abetted one of these crimes and that Murder was a natural and probable consequence of that crime, the defendant is guilty of Murder. You do not need to agree about which of these crimes the defendant aided and abetted."

The trial court also instructed with CALCRIM No. 1401 on the section 186.22, subdivision (b)(1) gang allegation.

C

Rocha asserts the evidence is insufficient to support his murder conviction because murder was not a natural and probable consequence of the target offenses of assault and/or challenge to fight in public in the circumstances of this case. Alternatively stated, he argues it was not reasonably foreseeable that the offenses of assault and/or challenge to fight in public in this case would result in Allen's murder.

Based on our review of the whole record, we conclude there is substantial evidence to support Rocha's conviction of second degree murder. We conclude there is substantial evidence to support the jury's implicit finding that Rocha intended to aid or abet Avalos's commission of the target offenses of assault and/or challenge to fight in public and that Allen's murder was a natural and probable consequence of those target offenses. Jones's trial testimony described how the incident occurred. Rocha approached Jones and asked for a lighter. After receiving that lighter, Rocha asked Jones whether he knew where he was. Jones replied, "Yeah, Carlsbad." Rocha then tilted his head and shoulders back, inflated his chest, and responded, "Carlos Malos." When Allen came

13

back to assist Jones and asked whether there was a problem, Avalos replied to Allen, "What's up, homie," pulled out a knife, and fatally stabbed Allen in the abdomen.

Detective Hargett testified that Rocha was an admitted gang member and met the Department of Justice's criteria for documentation as a gang member. In 2006, Rocha's father admitted he was the Carlsbad gang's "shot caller." Hargett also explained gang "hit ups" (e.g., "Where you from" and "Do you know where you are at") and stated they are likely to have a violent outcome. He also testified, as described above, regarding specific violent incidents involving the Carlsbad gang since 2006 that resulted in severe injuries to their victims and many of which involved the use of knives. Gang members tell others about their crimes to gain "respect." The jury could reasonably infer that, as a Carlsbad gang member, Rocha likely would have heard about many, if not all, of those past violent incidents involving the Carlsbad gang and the severe injuries suffered by their victims from the stabbings and beatings. The jury could reasonably infer Rocha had heard about the attack on Bryce Smith, the African-American high school student who was allegedly punched and kicked by Avalos and other Carlsbad gang members who were arrested for that incident. Also, during Rocha's interview with Hargett after the instant incident, Rocha admitted he "knew something was gonna happen to [Allen]." Based on all of the evidence, the jury could reasonably infer that when Rocha "hit up" Jones, he intended to aid and abet the commission of an assault and/or challenge to fight in public, knew that act was dangerous to human life, and deliberately acted with conscious disregard for human life. Furthermore, the jury could reasonably infer that a reasonable person in Rocha's position would have known that Avalos's murder of Allen was a natural and

14

probable consequence, or a reasonably foreseeable result, of the offenses of assault and/or challenge to fight in public in the circumstances of this case. Therefore, there was substantial evidence to support Rocha's conviction of second degree murder.

Contrary to Rocha's assertion, the fact that none of the Carlsbad gang's prior victims died following the attacks on them does not disprove the requirements that Rocha knew death was a reasonably foreseeable result of his "hit up" and the assault and/or challenge to fight in public *or* that a reasonable person in those circumstances would have reasonably foreseen Allen's murder could have resulted from those offenses. On the contrary, we conclude there was substantial evidence to support those findings, including evidence of specific prior violent incidents in which the victims of the Carlsbad gang sustained severe injuries that were life-threatening and, absent immediate medical treatment, could have resulted in their deaths. The jury could reasonably infer the Carlsbad gang members who inflicted those injuries had acted with conscious disregard for human life and Rocha was, and a reasonable person in his position and with his knowledge would have been, aware that Allen's murder was a natural and probable consequence of the commission of the offenses of assault and/or challenge to a fight in public in the circumstances of this case.

We also reject Rocha's assertion that because he did not know Avalos had a knife, he could not have known Allen's murder was a natural and probable consequence of his aiding and abetting the commission of the offenses of assault and/or challenge to fight in public. First, the jury was not required to infer from Rocha's interview statement--he "never seen any knife" that night--that he did not, in fact, know Avalos possessed a knife

15

that night. Rather, the jury could reasonably infer, based on the many Carlsbad gang incidents involving knife use, that Rocha knew Avalos had, or probably had, a knife at the time he (Rocha) "hit up" Jones and aided and abetted the assault and/or challenge to fight in public. Second, in any event, Rocha's knowledge of Avalos's possession of a knife was not a requirement for the jury to find that murder was a natural and probable consequence of the target offenses. Rather, the jury could reasonably infer, based on past Carlsbad gang violent incidents not involving knives, that the "hit up" in this case posed a danger to human life, whether by a beating or otherwise, such that murder was a natural and probable consequence of the target offenses. "[P]rior knowledge that a fellow gang member is armed is not necessary to support a defendant's murder conviction as an aider and abettor." (*Medina*, *supra*, 46 Cal.4th at p. 921; see also *People v. Montes* (1999) 74 Cal.App.4th 1050, 1056 [defendant need not know of perpetrator's intended use of weapon, but only intend to facilitate the target offense from which the charged crime is a foreseeable consequence]; *People v. Montano* (1979) 96 Cal.App.3d 221, 227.) Furthermore, contrary to Rocha's apparent assertion, he was not merely "present" during the assault and/or challenge to fight in public, but, as the jury impliedly found, aided and abetted the assault and/or challenge to fight in public that naturally and probably resulted in Allen's murder. (Cf. *People v. Stankewitz* (1990) 51 Cal.3d 72, 90.)

Finally, although we agree with Rocha that *Medina*, *supra*, 46 Cal.4th 913, is factually inapposite to this case, we nevertheless believe that case is instructive on the doctrine of natural and probable consequences and supports our conclusion there is substantial evidence to support Rocha's conviction of second degree murder. *Medina*

16

discussed that nontarget offenses may be the natural and probable consequence of target offenses if those nontarget offenses are reasonably foreseeable by a reasonable person in the aider and abettor's position. (*Id*. at p. 920.) To be reasonably foreseeable, the consequence need not have been a strong probability, but instead may be merely a possible consequence of the target offense. (*Ibid*.) Rocha cites as support for his contention the following language from *Medina*:

> "Contrary to the dissent's suggestion, there was more here than just verbal challenges by gang members. [Citation.] There was evidence that Barba refused to succumb to the gang assault despite being substantially outnumbered and defendants were unable to avenge themselves because of Barba's show of strength; gang culture (in which defendants were involved) emphasizes respect, fear, and retaliatory violence in the face of disrespectful behavior; Lil Watts was a violent street gang that regularly committed gun offenses; and a Lil Watts gang member had ready access to a gun at the scene. Even if the three aggressors did not intend to shoot Barba when they verbally challenged him, or at the start of the fistfight, it was or should have been reasonably foreseeable to these gang members that the violence would escalate even further depending on Barba's response to their challenge. [Citations.] Thus, given the fact that defendants were unable to avenge themselves for the perceived multiple instances of disrespectful behavior by Barba, the jury could reasonably have found that defendants would have or should have known that retaliation was likely to occur and that escalation of the confrontation to a deadly level was reasonably foreseeable as Barba was retreating from the scene." (*Medina, supra,* at pp. 927-928.)

Contrary to Rocha's assertion, the fact *Medina* involved rival gangs with access to a gun at the scene and other distinguishing circumstances does not show that murder was not a natural and probable consequence of Rocha's aiding and abetting the offenses of assault and/or challenge to fight in public in the circumstances of this case. We conclude there is substantial evidence to support his conviction of second degree murder.

17

## II

### *INSTRUCTION ON INVOLUNTARY MANSLAUGHTER AS A LESSER INCLUDED OFFENSE OF MURDER*

Rocha contends the trial court prejudicially erred by not instructing sua sponte on involuntary manslaughter as a lesser included offense (LIO) of murder.

### A

Murder is the unlawful killing of a human being *with malice* aforethought. (§ 187, subd. (a).) Malice, the mens rea for murder, is a specific intent to kill or a conscious disregard for life. (*People v. Rios* (2000) 23 Cal.4th 450, 460.) Malice may be express when a defendant manifests "a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.) Malice may be implied when the killing results from an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who *knows his or her conduct endangers the life of another* and who acts *with conscious disregard for life*. (*People v. Lasko* (2000) 23 Cal.4th 101, 107; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1215.)

Manslaughter is the unlawful killing of a human being *without malice*. (§ 192.) "A defendant lacks malice and is guilty of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"-- the unreasonable but good faith belief in having to act in self-defense [citations].' " (*People v. Blakeley* (2000) 23 Cal.4th 82, 87-88.) Furthermore, "when a defendant,

18

acting with a conscious disregard for life, unintentionally kills in unreasonable self-defense, the killing is voluntary . . . manslaughter." (*Id.* at p. 91.)

Involuntary manslaughter generally is the unlawful killing of a human being without malice (i.e., without an intent to kill and *without a conscious disregard for life*.) (§ 192, subd. (b); CALCRIM No. 580.)  There are two statutory forms of involuntary manslaughter:  (1) a killing during the commission of an unlawful act not amounting to a felony (e.g., misdemeanor); and (2) a killing in the commission of a lawful act that might produce death, in an unlawful manner or without due caution and circumspection. (§ 192, subd. (b).)  In addition, a nonstatutory form of committing involuntary manslaughter is based on a predicate act of a noninherently dangerous felony committed without due caution and circumspection.  (*People v. Butler* (2010) 187 Cal.App.4th 998, 1007; *People v. Blakeley, supra,* 23 Cal.4th at p. 89; *People v. Burroughs* (1984) 35 Cal.3d 824, 835-836.)  "[W]here involuntary manslaughter is predicated on an unlawful act constituting a misdemeanor, it must still be shown that such misdemeanor was dangerous to human life or safety under the circumstances of its commission."  (*People v. Cox* (2000) 23 Cal.4th 665, 675.)  "The inherent or abstract nature of a misdemeanor which underlies an involuntary manslaughter charge is not dispositive."  (*People v. Wells* (1996) 12 Cal.4th 979, 988.)  All forms of involuntary manslaughter require the mens rea of criminal negligence, which is a disregard for human life judged by an objective, or reasonable person, standard.  (*Butler*, *supra,* at pp. 1007-1009.)  Alternatively stated, a defendant acts with criminal negligence when he or she acts in a reckless way that creates a high risk of death or great bodily injury and a reasonable person would have known that

19

acting that way would create such a risk. (CALCRIM No. 580.) However, if that person unlawfully kills another with an intent to kill or a conscious disregard for human life, the offense is either murder or voluntary manslaughter. (*Ibid*.)

"Both murder (based on implied malice) and involuntary manslaughter involve a disregard for life; however, for murder the disregard is judged by a subjective standard whereas for involuntary manslaughter the disregard is judged by an objective standard. [Citations.] Implied malice murder requires a defendant's conscious disregard for life, meaning that the defendant subjectively appreciated the risk involved. [Citation.] In contrast, involuntary manslaughter merely requires a showing that a reasonable person would have been aware of the risk. [Citation.] Thus, even if the defendant had a subjective, good faith belief that his or her actions posed no risk, involuntary manslaughter culpability based on criminal negligence is warranted if the defendant's belief was objectively unreasonable." (*People v. Butler*, *supra*, 187 Cal.App.4th at pp. 1008-1009, fn. omitted.)

B

"In a criminal case, a trial court must instruct on the general principles of law relevant to the issues raised by the evidence." (*People v. Earp* (1999) 20 Cal.4th 826, 885.) "The trial court has a sua sponte duty to instruct on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present and there is evidence that would justify a conviction of such a lesser offense." (*People v. Cooper* (1991) 53 Cal.3d 771, 827 (*Cooper*).) An instruction on an LIO is not required when there is no evidence to support a finding the LIO was

20

committed.  (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).)
Alternatively stated, "a trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence.  On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support."  (*Id*. at p. 162.)  "[A] trial court is not required to instruct the jury as to all lesser included offenses, only those that 'find substantial support in the evidence.' "  (*People v. Medina* (2007) 41 Cal.4th 685, 700.)  "Under California law, a lesser offense is necessarily included in a greater offense if . . . the statutory elements of the greater offense . . . include all the elements of the lesser offense, such that the greater offense cannot be committed without also committing the lesser."  (*People v. Birks* (1998) 19 Cal.4th 108, 117.)

"[T]he failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility. . . .  [S]uch misdirection of the jury is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.  [Citations.]"  (*Breverman, supra,* 19 Cal.4th at p. 165; see also *People v. Wyatt* (2012) 55 Cal.4th 694, 698.)

C

Rocha asserts that because there was substantial evidence to have supported a finding by the jury that he did not have the subjective mental state required for murder (i.e., malice), the trial court erred by not instructing sua sponte on involuntary manslaughter as an LIO of murder.  Although the trial court instructed the jury on murder

21

and voluntary manslaughter as an LIO of murder, it did not instruct on involuntary manslaughter as an LIO of murder.

Even if we assume the trial court erred in not sua sponte instructing the jury on the lesser included offense of involuntary manslaughter, we conclude the error did not prejudice Rocha. "[W]hen a trial court violates state law by failing to properly instruct the jury on a lesser included offense, this test applies: '[I]n a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under [*People v.*] *Watson* [(1956) 46 Cal.2d 818, 836 [299 P.2d 243]]. A conviction of the charged offense may be reversed in consequence of this form of error only if, "after an examination of the entire cause, including the evidence" (Cal. Const., art. VI, § 13), it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the error not occurred [citation]. [Citation.]' " (*People v. Lasko, supra,* 23 Cal.4th at p. 111.)

In applying the *Watson* standard of prejudice, we follow our high court's guidance in *Breverman, supra,* 19 Cal.4th 142:

> "Appellate review under *Watson* . . . focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." (*Id.* at p. 177; original italics.)

22

Based on our review of the record, we conclude the trial court's error was harmless under the *Watson* standard. Here, on the record before us, we determine the jury was not likely to have convicted Rocha of involuntary manslaughter in the absence of the error. In making this determination, we stress the context of the events in question: This was a gang case.[2]

Rocha is a gang member. Avalos is a gang member of the same gang. The jury was presented with mountainous evidence regarding the gang's typical activities. Such activities included attacking victims with knives and targeting African-Americans. Moreover, the prosecution presented evidence that Avalos was arrested for one of the gang's previous attacks on an African-American young male.

In addition, the jury convicted Rocha of second degree murder as an aider and abettor under the natural and probable consequences doctrine. This theory only makes sense within the gang framework presented by the prosecution at trial. Rocha "hit up" Jones. After which, Allen essentially asked if there was a problem. In response to Allen's question, Avalos stabbed him, and Jones punched Rocha. Then everyone fled. Such an interaction among the four men can only be understood within the gang context.

Further, the jury found beyond a reasonable doubt that Rocha was aware that Allen's murder was a natural and probable consequence of the offenses of assault and/or

---

[2]    Rocha does not directly challenge the jury's finding that the murder was committed for the benefit of a criminal street gang. Rather, in regard to the gang allegations, he contends: (1) the evidence is insufficient to show his gang had a primary activity of any of the offenses listed in section 186.22, subdivision (e); and (2) the trial court erred in instructing on the elements of the gang allegation. As we discuss below, these contentions are without merit.

challenge to a fight in public. The jury also found that the murder was committed for the benefit of a gang. Again, the jury believed the prosecution's theory that the murder was a logical consequence of Rocha's "hit up" of Jones. In other words, without the gang component, the prosecution's theory of the case would have crumbled. Moreover, we note that in making this finding, the jury had to find beyond a reasonable doubt that Rocha harbored the necessary malice (either express or implied) to convict him of second degree murder. (See *People v. Chun* (2009) 45 Cal.4th 1172, 1181.)

Despite the abundance of evidence to support the gang theory against Rocha, he argues that the trial court's failure to give an involuntary manslaughter instruction prejudiced him. To support his position, Rocha focuses on certain statements he made to the police. For example, Rocha told the police that he "never seen any knife" on the night Allen was stabbed, and he was startled by the events that occurred after he asked Allen for a light. Neither of these statements persuades us that it is likely that the jury would have convicted Rocha of involuntary manslaughter instead of second degree murder.

Rocha's statement that he "never seen any knife" that night could imply that he was unaware that Avalos had a knife on the night in question. That said, Rocha's knowledge of Avalos's possession of the knife is not of the moment. As we discuss above, Rocha's knowledge of Avalos's possession of a knife was not a requirement for the jury to find that murder was a natural and probable consequence of the target offenses. Instead, the jury could reasonably infer that the "hit up" in this case posed a danger to human life, whether by a beating or otherwise, such that murder was a natural and probable consequence of the target offenses. (See *Medina*, *supra*, 46 Cal.4th at pp. 921-

24

923; *People v. Montes*, *supra*, 74 Cal.App.4th at pp. 1055-1056.) Indeed, such a consequence was argued by the prosecution and supported by the testimony of its gang expert.

Also, Rocha's statement that he was startled by the events that occurred, does not convince us that the lack of an involuntary manslaughter instruction prejudiced Rocha. Again, we view this statement in the context of the gang violence of this case. Rocha does not address the evidence supporting the gang allegations in relation to his claim that the failure to give the involuntary manslaughter instruction prejudiced him. He provides no authority that requires us to evaluate Rocha's statements in a vacuum, ignoring the gang evidence against him. Indeed, under *Breverman*, *supra*, 19 Cal.4th 142, we cannot do so. Simply put, unless we disregard the gang evidence in this case, Rocha's statements to the police, by themselves, do not lead us to conclude the failure to provide the involuntary manslaughter instruction prejudiced Rocha.

On this record, it is not reasonably probable that Rocha would have obtained a more favorable outcome had the jury been instructed on the lesser included offense of involuntary manslaughter, and any error is therefore harmless. (See *People v. Lasko*, *supra*, 23 Cal.4th at p. 111.)

25

## III

### *SUBSTANTIAL EVIDENCE TO SUPPORT FINDING OF*
### *GANG'S PRIMARY ACTIVITY*

Rocha contends the evidence is insufficient to support the jury's finding that the Carlsbad gang had as one of its primary activities one or more of the offenses listed in section 186.22, subdivision (e).

### A

The information alleged Rocha committed the murder of Allen for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1), which provides:

> "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished as follows: . . . ."

A "criminal street gang" is defined as "any ongoing organization, association, or group of three or more persons, whether formal or informal, *having as one of its primary activities the commission of one or more of the criminal acts enumerated in* paragraphs (1) to (25), inclusive, or (31) to (33), inclusive, of *subdivision (e)*, having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."  (§ 186.22, subd. (f), italics added.)  Among the various criminal offenses listed in section 186.22,

26

subdivision (e), is the offense of assault with a deadly weapon or by means of force likely to produce great bodily injury.  (§ 186.22, subd. (e)(1).)

The trial court instructed the jury with CALCRIM No. 1401 on the section 186.22, subdivision (b)(1) allegation.  After finding Rocha guilty of second degree murder, the jury then found true the allegation Rocha committed that murder for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1).

B

We conclude there is substantial evidence to support the jury's finding Rocha committed the murder for the benefit of a criminal street gang.  There is substantial evidence to support the finding that one of the primary activities of the Carlsbad gang was the commission of one or more of the criminal acts listed in section 186.22, subdivision (e).

"Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute.  Also sufficient might be expert testimony [e.g., testimony of a police gang expert] . . . ."  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 324 (*Sengpadychith*).)  Therefore, if a police gang expert testifies, based on his or her personal investigations and information obtained from other law enforcement sources, that a particular gang was primarily engaged in one or more of the criminal acts listed in section 186.22, subdivision (e), that expert testimony may be sufficient evidence to support a section 186.22, subdivision (b)(1) allegation.  (*Sengpadychith, supra,* at p. 324; *People v. Gardeley* (1996) 14 Cal.4th 605, 620.)

27

Detective Hargett, the prosecution's gang expert, testified regarding many prior violent acts committed by members of the Carlsbad gang. He testified regarding the attacks on Torres, who was driving with his friends through Carlsbad in response to a Craigslist "for sale" advertisement. They stopped when young gang members threw rocks at their car. As they called police, older gang members approached Torres and his friends and asked them why they were messing with the "little homies." A fight ensued and Torres was stabbed eight to 10 times in the front and back of his torso. He was "life-flighted" for emergency medical treatment. Jesus Hernandez and Edgar Zepeda were convicted for attacking Torres and copies of their convictions were admitted into evidence as predicate offenses committed by members of the Carlsbad gang.

Hargett also testified regarding the attack on Eric Allen, an African-American, who was driving through the Carlsbad barrio when "some guys" signaled for him to slow down. Allen stopped his car, got out, and apologized, stating: "Hey, I know I am in the hood. Sorry. No disrespect." Christian Gill, a Carlsbad gang member, stabbed Allen once in the arm and once in the gut with a small, pocket-style folding knife with a blade about two and one-half inches long. With "about two feet of his intestines hanging out through his stab wound," Allen was able to get back into his car and drive to a nearby house from which he was then "life-flighted" to a hospital. Gill was convicted for stabbing him. A copy of Gill's conviction for his attack on Eric Allen was admitted into evidence.

Although Hargett did not specify the criminal offenses of which Hernandez, Zepeda, and Gill were convicted, the jury received copies of their criminal convictions

28

that presumably set forth that information.[3]  Hargett also testified on the violent attacks by other Carlsbad gang members on Johnny Pliego, Bryce Smith, Alex Lopez, and Frederick Baker.  Importantly, Hargett expressed his expert opinion that the Carlsbad gang "consistently engaged in a pattern of criminal activity."  We conclude Hargett had an adequate foundation on which to form that opinion.  Based on Hargett's expert testimony and documentary evidence of criminal convictions of Carlsbad gang members for two of the six violent attacks discussed above, the jury could reasonably infer that one of the primary activities of the Carlsbad gang was the commission of one or more of the offenses listed in section 186.22, subdivision (e) (e.g., assault with a deadly weapon or by means of force likely to produce great bodily injury).  There is substantial evidence to support the jury's finding Rocha committed the murder for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1).  (Cf. *Sengpadychith*, *supra*, 26 Cal.4th at p. 324; *People v. Gardeley*, *supra*, 14 Cal.4th at p. 620.)

IV

*INSTRUCTION ON ELEMENTS OF*
*SECTION 186.22, SUBDIVISION (B)(1) ALLEGATION*

Rocha contends the trial court erred in instructing on the elements of the section 186.22, subdivision (b)(1) gang enhancement allegation.  He argues that because the trial court omitted from that instruction the specific types of crimes committed by Carlsbad

---

[3]     Although the People were unable to locate Exhibits Nos. 30, 31, and 32, we presume, and Rocha does not dispute, those exhibits did, in fact, set forth criminal acts committed by Hernandez, Zepeda, and Gill that are listed in section 186.22, subdivision (e).

29

gang members, the jury was not instructed on which specific crimes were the gang's primary activities within the definition of a criminal street gang. (§ 186.22, subds. (b)(1), (e).)

A

Out of the jury's presence, the trial court inquired of the parties' counsel whether there were any stipulations. The prosecutor replied: "I think [defense counsel] and I are essentially stipulating to the fact that the two blue-back priors we have for predicate crimes contain crimes within [section] 186.22[, subd.] (b). So you don't have to give . . . instructions on those crimes to the jury." Rocha's counsel did not express any disagreement with the prosecutor's statement. The court accepted the parties' stipulation.

The trial court instructed the jury with the following modified version of CALCRIM No. 1401:

> "If you find the defendant guilty of the crimes charged in Count One, or the lesser offense of voluntary manslaughter, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime.
>
> "To prove this allegation, the People must prove that:
>
> "1. The defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang; [¶] AND
>
> "2. The defendant intended to assist, further, or promote criminal conduct by gang members.
>
> "A *criminal street gang* is any ongoing organization, association, or group of three or more persons, whether formal or informal:

30

"1. That has a common name or common identifying sign or symbol;

"2. That has, as one or more of its primary activities, the commission of c [sic]; [¶] AND

"3. Whose members, whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity.

"In order to qualify as a *primary* activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group. . . ."

The jury found true the allegation Rocha committed the murder for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1).

B

Rocha argues the trial court erred by instructing with a version of CALCRIM No. 1401 that omitted the specific predicate crimes that allegedly provided the basis for the second element for a finding that the Carlsbad gang was a criminal street gang (i.e., the gang had as one of its primary activities the commission of those specific types of crimes). However, Rocha waived or forfeited that purported error by stipulating to that omission. As discussed above, the prosecutor pronounced on the record the parties' stipulation "to the fact that the two blue-back priors we have for predicate crimes contain crimes within [section] 186.22[, subd.] (b). So you don't have to give . . . instructions on those crimes to the jury." Therefore, to the extent the court erred by omitting those specific predicate crimes, Rocha invited that error and cannot now raise it on appeal. (*Cooper, supra,* 53 Cal.3d at p. 831.) We disagree with Rocha's argument that his

31

stipulation dealt only with the third element for a criminal street gang finding (i.e., a pattern of criminal gang activity). Rather, the list of predicate crimes set forth in section 186.22, subdivision (e) applies to both the second and third elements for a criminal street gang finding for purposes of a section 186.22, subdivision (b)(1) allegation. (§ 186.22, subds. (e), (f).) Therefore, the parties' stipulation that the two "blue-back priors" (i.e., the stabbings of Torres and Eric Allen discussed above) were predicate crimes for purposes of section 186.22, subdivision (b)(1), and Rocha's stipulation that the court need not instruct on those crimes constituted not only invited instructional error, but also an admission that the requirement for the section 186.22, subdivision (b)(1) allegation was satisfied.

Assuming arguendo Rocha did not invite that error and/or admit the Carlsbad gang had committed specific crimes as one of its primary activities within the meaning of the section 186.22, subdivision (b)(1) allegation, we nevertheless would conclude the trial court's instructional error was harmless. The court had a duty to instruct sua sponte on the elements of the section 186.22, subdivision (b)(1) allegation. (*Sengpadychith*, *supra*, 26 Cal.4th at p. 325.) By omitting from its instruction with CALCRIM No. 1401 the specific predicate crimes for the second element of the definition of a criminal street gang within the meaning of section 186.22, subdivision (b)(1), the court erred. However, we conclude that error was harmless under either the federal or California standard of prejudice. Under the California standard of *Watson*, *supra*, 46 Cal.2d 818, which applies when the gang enhancement would not increase Rocha's punishment, such as in the case of an indeterminate sentence for murder as the court imposed in this case (see

32

*Sengpadychith*, at pp. 325-327), we conclude it is not reasonably probable he would have obtained a more favorable result had the court not so erred. The jury received copies of the criminal convictions of Hernandez, Zepeda, and Gill for their vicious attacks on Torres and Eric Allen. As Rocha concedes, because those attacks involved stabbings with great bodily injury, they necessarily constituted predicate crimes for purposes of the section 186.22, subdivision (b)(1) allegation. Therefore, had the court's instruction with CALCRIM No. 1401 specifically listed the type(s) of those predicate crimes (e.g., assault with a deadly weapon or by means of force likely to produce great bodily injury), we have no doubt the jury would have made the same true finding on the section 186.22, subdivision (b)(1) allegation. It is not reasonably probable Rocha would have obtained a more favorable result had the court not erred by omitting those specific predicate crimes from its instruction. (*Watson, supra*, at p. 836; *Sengpadychith, supra,* at p. 327.)

Alternatively, even applying the federal standard of prejudice (*Chapman v. California* (1967) 386 U.S. 18, 24), we conclude that instructional error was harmless beyond a reasonable doubt. The criminal convictions of Hernandez, Zepeda, and Gill for their vicious attacks on Torres and Eric Allen involved stabbings with great bodily injury and therefore necessarily constituted predicate crimes (e.g., assault with a deadly weapon or by means of force likely to produce great bodily injury) for purposes of the section 186.22, subdivision (b)(1) allegation. Because there is no reasonable possibility of any finding by a jury other than that those predicate crimes were of the type listed in section 186.22, subdivision (e), for purposes of determining whether the Carlsbad gang was a criminal street gang within the meaning of section 186.22, subdivision (b)(1), the trial

33

court's error in omitting the specific predicate crimes for the second element of the criminal street gang definition was harmless beyond a reasonable doubt. (*Chapman, supra,* at p. 24.)

V

*INSTRUCTIONS ON ELEMENTS OF TARGET OFFENSES*

Rocha contends the trial court erred by not instructing on all of the elements of the uncharged target offenses (i.e., assault and/or challenge to fight in public) that provided the basis for the murder charge. He argues that because the trial court erred in instructing on the gang allegation, as discussed above, and the court's instructions on the natural and probable consequence theory of murder listed the two uncharged target offenses (i.e., assault and/or challenge to fight in public) and thereafter included a parenthetical referring to the related gang allegation, the trial court did not properly instruct on all of the elements of the target offenses and, therefore, of murder.

A

The trial court instructed with CALCRIM Nos. 403 and 520 on the natural and probable consequences theory of implied malice murder. The court instructed with a modified version of CALCRIM No. 403 on the doctrine of natural and probable consequences, stating:

> "Before you may decide whether the defendant is guilty of Murder, you must decide whether he is guilty of Assault and/or Challenge to Fight in Public.

> "To prove that the defendant is guilty of Murder, the People must prove that:

34

"1.  The defendant is guilty of Assault and/or Challenge to Fight in Public *(with gang allegations)*.

"2.  During the commission of Assault and/or Challenge to Fight in Public *(with gang allegations)*, a coparticipant in that Assault committed the crime of Murder; [¶] AND

"3.  Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the Murder was a natural and probable consequence of the commission of the Assault and/or Challenge to Fight in Public (*with gang allegations*)."  (Italics added.)

The jury found Rocha guilty of murder and found true the section 186.22, subdivision (b)(1) gang allegation.

B

Rocha asserts the trial court's instruction with the modified version of CALCRIM No. 403, quoted above, had the effect of making the section 186.22, subdivision (b)(1) gang allegation an additional element of the uncharged target offenses of assault and challenge to fight in public for purposes of the natural and probable consequences theory of implied malice murder.  He argues that although the trial court instructed on the elements of the uncharged target offenses of assault and challenge to fight in public, the court erred by not clearly instructing the jury on what it intended by including the "gang allegations" parenthetical that followed its listing of the target offenses in CALCRIM No. 403.

We are satisfied the trial court's instructions on the natural and probable consequences theory of implied malice murder, when construed together with all of the other instructions, were correct and not misleading.  The court's modified version of

35

CALCRIM No. 403 could not reasonably be construed as adding another element to the uncharged target offenses (i.e., the element of "gang allegations").  On the contrary, when considered together with the other instructions, the jury certainly understood the parenthetical "with gang allegations" merely referred to the related section 186.22, subdivision (b)(1) gang allegation, and did not constitute an additional element of the uncharged target offenses of assault and challenge to fight in public for purposes of the natural and probable consequences theory of implied malice murder.

DISPOSITION

The judgment is affirmed.

_____<br>HUFFMAN, Acting P. J.

I CONCUR:


_____
McINTYRE, J.

McDonald, J., Dissenting.

I agree with a considerable portion of the well-written and thoughtful majority opinion.  I disagree with that portion of the majority opinion concluding the trial court's failure to instruct sua sponte on the crime of involuntary manslaughter, if error, was not prejudicial to Rocha under the *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) state standard of prejudice.  I would reverse the judgment of conviction for second degree murder because of the prejudicial error not to instruct sua sponte on involuntary manslaughter and remand the matter to the superior court with directions to enter a judgment of guilty of involuntary manslaughter and resentence Rocha accordingly unless the People elect within 60 days after the filing of the remittitur in the superior court to bring Rocha to a retrial on the murder charge.

It has long been held that manslaughter is generally a lesser included offense (LIO) of murder.  (*People v. Lewis* (2001) 25 Cal.4th 610, 645 ["Manslaughter, both voluntary and involuntary, is a lesser included offense of murder."]; *People v. Sanchez* (2001) 24 Cal.4th 983, 989-992 [recognizing general rule, but holding gross vehicular manslaughter is not an LIO of murder]; *People v. Thomas* (1987) 43 Cal.3d 818, 824 [charge of murder included by implication a charge of the LIO's of voluntary and involuntary manslaughter].)  Murder is an unlawful killing that requires malice, whether express (i.e., an intent to kill) or implied (i.e., conscious disregard for life), and involuntary manslaughter is an unlawful killing without malice, but with an objective, not subjective, disregard for life.  If a reasonable person would have known the commission of a misdemeanor in the circumstances of that act would be dangerous to human life (i.e.,

would create a high risk of death or great bodily injury), then the defendant is criminally negligent and guilty of involuntary manslaughter. Because under California law the statutory elements of murder include all of the elements of involuntary manslaughter, so that murder cannot be committed without also committing the lesser offense, involuntary manslaughter is an LIO of murder. (*People v. Birks* (1998) 19 Cal.4th 108, 117; *Sanchez*, at p. 989; *Thomas*, at p. 824.) If there is substantial evidence in the record to support a finding that Rocha committed involuntary manslaughter but not murder, the trial court was required to instruct sua sponte on involuntary manslaughter as an LIO of murder. *People v. Cooper* (1991) 53 Cal.3d 771, 827; *People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*); *People v. Medina* (2007) 41 Cal.4th 685, 700.)

Based on my review of the whole record, I conclude there *is* substantial evidence to support a finding that Rocha committed involuntary manslaughter but not murder. A reasonable jury could have found Rocha did not aid and abet the assault and/or challenge to fight in public with the knowledge those misdemeanor offenses were dangerous to life, or created a high risk of death or great bodily injury, in the circumstances of this case, but that a reasonable person in his position would have had such knowledge.[1] Alternatively

---

[1]  Rocha asserts, and the People apparently concede, the relevant unlawful target offenses in this case are the misdemeanors of assault and challenge to fight in public, which were not transformed into felony offenses by reason of the related gang allegations. Although the gang allegations may have allowed punishment of the target offenses as felonies, for purposes of determining whether a trial court has a duty to instruct sua sponte on involuntary manslaughter, I presume the target offenses themselves should be considered without related enhancement allegations. The People do not cite any cases showing otherwise.

2

stated, a jury could reasonably find Rocha did not act with a conscious disregard for human life when he aided and abetted the commission of those misdemeanor offenses, but a reasonable person in his position would have known those acts in the circumstances of their commission would have been dangerous to human life.

In the circumstances of this case, the jury could have found the prosecution had not met its burden to prove beyond a reasonable doubt that Rocha, in fact, knew the misdemeanor offenses he aided and abetted were dangerous to human life. For example, the jury could have reasonably found that when Rocha approached Jones, asked him for a lighter, and then asked him where he was from, Rocha did not, in fact, know he was creating a high risk of death or great bodily injury to another human (e.g., to Allen or Jones). There was no evidence Rocha had been involved in any prior violent incidents with the Carlsbad gang, and the jury could have declined to infer that he had heard of sufficient other violent incidents involving his gang so as to attribute to him the knowledge that such a "hit up" in the circumstances of this case was likely to be dangerous to human life. Furthermore, the jury could have found unpersuasive the prosecution's argument that Hargett's testimony showed Rocha knew about those prior incidents and/or that he knew a "hit up" was dangerous to human life. Although Hargett testified that "hit ups" often led to violence, the jury could have found Rocha did not, in fact, know his "hit up" of Jones created a danger of such great violence that it was dangerous to human life.

Furthermore, the jury could have inferred from the evidence that Rocha did not know Avalos possessed a knife that night. During his interview with Hargett, Rocha

3

stated he did not see a knife during the incident. Rocha also told Hargett that "nothing [was] supposed to go down," which the jury could have reasonably interpreted as meaning Rocha did not have any intent to harm anyone and did not, in fact, know his aiding and abetting the assault and/or challenge to fight in public created a danger to human life. Rocha also told Hargett he was just trying to have a normal conversation with Jones when he asked him for the lighter. He further stated his question to Jones about where he was from was not a gang-related question. He also told Hargett he "never had any intentions" and was innocent, which the jury could have reasonably interpreted as meaning Rocha did not intend to create any risk to human life and did not, in fact, have the subjective knowledge that his aiding and abetting the misdemeanor offenses created a high risk of death or great bodily injury in the circumstances of this case. There is substantial evidence to support a finding by a jury that Rocha did not have the subjective intent (i.e., *conscious* disregard for human life) required for murder based on implied malice, but nevertheless a reasonable person in Rocha's position would have known the assault and/or challenge to fight in public that he aided and abetted would create a high risk of death or great bodily injury in the circumstances of that act. Because there is substantial evidence to support a finding Rocha committed involuntary manslaughter but not murder, the trial court erred by not instructing sua sponte on involuntary manslaughter as an LIO of murder. (*People v. Cooper*, *supra*, 53 Cal.3d at p. 827; *Breverman*, *supra*, 19 Cal.4th at pp. 154, 162; *People v. Medina*, *supra*, 41 Cal.4th at p. 700.)

4

Although the People extensively cite evidence in the record that supports a finding Rocha had the subjective knowledge his aiding and abetting those misdemeanor offenses created a danger to human life in the circumstances of the commission of those offenses, in so doing they misinterpret and/or misapply the applicable standard of review. In determining whether the trial court erred by not instructing on involuntary manslaughter, we review the record independently to determine whether there is substantial evidence to support a finding that Rocha committed involuntary manslaughter but not murder, and not, as the People apparently argue, whether there is substantial, or even "overwhelming," evidence that Rocha had the requisite subjective knowledge (i.e., conscious disregard for human life) for murder. I am not persuaded by the People's recitation of the evidence, and inferences therefrom, that is favorable to support the jury's murder verdict constitutes proof there was insufficient evidence for a finding by a reasonable jury that Rocha lacked the subjective intent, but a reasonable person in his position would have known the misdemeanor offenses created a risk to human life in the circumstances of their commission.

Rocha contends he was prejudiced by the trial court's error in not instructing sua sponte on involuntary manslaughter as an LIO of murder. He argues that had the trial court instructed on that LIO, it is reasonably probable the jury would have found him guilty of involuntary manslaughter instead of murder.

I agree the trial court's instructional error was prejudicial. Based on my review of all the evidence, I conclude it is reasonably probable Rocha would have obtained a more favorable outcome had the trial court instructed the jury on involuntary manslaughter as

5

an LIO of murder. (Cal. Const., art. VI, § 13; *Breverman*, *supra*, 19 Cal.4th at p. 165; *Watson*, *supra*, 46 Cal.2d at p. 836; *People v. Wyatt*, *supra*, 55 Cal.4th at p. 698.) In applying the "reasonably probable" standard of prejudice, the California Supreme Court stated: "[A] 'probability' in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) Based on my review of the record, I conclude the evidence in support of a finding that Rocha had the requisite subjective intent (i.e., conscious disregard for life) for murder based on implied malice, although substantial enough to support the murder verdict, was not overwhelming and was instead based on inferences that, although reasonable, were unlikely to have been made by a reasonable jury had it been instructed on the LIO of involuntary manslaughter.

There was no direct evidence Rocha was aware of the past violent incidents on which Hargett testified. Furthermore, based on Hargett's testimony, in only a couple of those incidents was the violence preceded by a "hit up" by the Carlsbad gang. Hargett conceded that most "hit ups" went unreported to police because they did not result in violence. Therefore, although the evidence was strong Rocha was a member of the Carlsbad gang, the evidence in support of inferences that Rocha knew about all of the prior violent incidents involving the Carlsbad gang and that his "hit up" of Jones created a danger to human life was weak.

Although Hargett testified "hit ups" that occur within close physical proximity to another person "mostly will become [sic] . . . a violent outcome," he did not testify that the "violent outcome" typically was death or great bodily injury. I conclude that had the

6

jury been instructed on involuntary manslaughter as an LIO, there was a reasonable chance the jury would *not* have inferred Rocha, in fact, *knew* his "hit up" of Jones and the assault and/or challenge to fight in public he aided and abetted created a danger to human life and would have, instead, concluded he did *not* have a *conscious* disregard for human life.

My conclusion is further supported by a lack of evidence showing Rocha had been involved in any prior violent incidents and/or that he knew Avalos possessed a knife when he (Rocha) "hit up" Jones. Also, the evidence shows Avalos acted quickly, and illogically, during the incident, thereby supporting a finding Rocha did *not* have the knowledge that the assault and/or challenge to fight in public would, in the circumstances of this case, create a high risk of death or great bodily injury. The entire incident occurred in less than one minute. When Rocha "hit up" Jones, Allen came back and asked whether there was a problem. Avalos then replied, "What's up, homie," pulled out a pocket knife, and fatally stabbed Allen in the abdomen. Prior to the stabbing, neither Jones nor Allen took any actions that could have been reasonably construed as warranting violence, escalating the matter, or otherwise confrontational. In the circumstances of this case, it was highly unlikely Rocha could have foreseen, much less known, Avalos would have acted in that manner or otherwise acted in disregard for human life. I conclude it is reasonably probable the jury would have found Rocha guilty of involuntary manslaughter rather than murder had the trial court instructed sua sponte on involuntary manslaughter as an LIO of murder. Alternatively stated, I conclude there was a reasonable chance Rocha would have received a more favorable outcome had the trial court instructed on

7

involuntary manslaughter as an LIO of murder.  (*College Hospital Inc. v. Superior Court*, *supra*, 8 Cal.4th at p. 715.)  My confidence in the jury's verdict is undermined by the trial court's failure to instruct sua sponte on involuntary manslaughter as an LIO of murder.  Therefore, Rocha's conviction of second degree murder should be reversed.  (Cal. Const., art. VI, § 13; *College Hospital Inc.*, at p. 715; *Breverman*, *supra*, 19 Cal.4th at p. 165; *Watson*, *supra*, 46 Cal.2d at p. 836; *People v. Wyatt*, *supra*, 55 Cal.4th at p. 698.)

_____

McDONALD, J.

8